**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ARNOLD BLAKE and JOEL DEFFEBAUGH<br><br>*Plaintiffs,*<br><br>v.<br><br>SULZER CHEMTECH USA, INC.,<br><br>*Defendants.* | Jury Trial Demanded<br><br>Civil Action No.: _____ |

**PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND**

COME NOW PLAINTIFFS **ARNOLD BLAKE** and **JOEL DEFFEBAUGH** complaining of Defendant **SULZER CHEMTECH USA, INC**. and for cause of action would show the Court and jury as follows:

**A.   JURISDICTION AND VENUE**

1. The court has subject matter jurisdiction over the lawsuit because the action arises under Title VII of the Civil Rights Act of 1964, as amended, for discrimination, hostile work environment and retaliation for filing a complaint under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

2. This Court has supplemental jurisdiction over PLAINTIFFS' state statutory causes of action arising out of the same case or controversy as the civil action over which this Court has original jurisdiction. 28 U.S.C. § 1367(a).

3. Venue exists in this district and division as detailed in 28 U.S.C. §1391.

**B.   EXHAUSTION OF ADMINISTRATIVE REMEDIES**

4. PLAINTIFFS each filed a charge with the Equal Employment Opportunity Commission (EEOC) of discrimination (race and national origin) and retaliation

against the Defendant.  PLAINTIFFS file this complaint within 90 days after receiving a notice of right to sue from the EEOC.  All conditions precedent to the institution of this lawsuit have been fulfilled.

### C. PARTIES

5. PLAINTIFF ARNOLD BLAKE is an individual who resides in Harris County.

6. PLAINTIFF JOEL DEFFEBAUGH is an individual who resides in Harris County.

7. DEFENDANT SULZER is a Texas corporation doing business in Harris County, headquartered in Harris County, with its corporate office located at 8505 E. North Belt Drive, Humble, Texas, 77396.  SULZER is an employer engaging in an industry affecting interstate commerce and employs more than 15 regular employees.  SULZER can be served through its registered agent, C.T. Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas, 75201-3136.

### D. MATERIAL FACTS – ARNOLD BLAKE AND JOEL DEFFEBAUGH

8. PLAINTIFF BLAKE is an African-American who was hired by SULZER on March 1, 2015 for the position of Hole Watch/Fire Watch.

9. PLAINTIFF DEFFEBAUGH was hired by SULZER in March 2012 for the position of Mechanic.

10. The majority of SULZER employees are Hispanics.

11. The majority of SULZER employees are Hispanics hired mostly from "The Valley" in Texas.

12. PLAINTIFFS (as well as other African-Americans and non-Hispanics) were treated less favorably than SULZER's Hispanic employees in terms of their conditions of employment.

13. PLAINTIFFS (as well as other African-Americans and non-Hispanics) were paid less than Hispanics who were either in the same role, or doing the same work.

14. PLAINTIFFS (as well as other African-Americans and non-Hispanics) were also discriminated against in their job assignments, routinely given entry level or redundant jobs despite their experience level.

15. PLAINTIFFS (as well as other African-Americans and non-Hispanics) were also given job assignments below their qualifications.

16. PLAINTIFFS (as well as other African-Americans and non-Hispanics) were discriminated in terms of being practically excluded from meetings because Safety Meetings and "start of shift" meetings are held either exclusively or primarily in Spanish, leaving PLAINTIFFS to inquire (outside of the meetings) as to what had been said in order to determine their scope of work for the day.

17. PLAINTIFFS (as well as other African-Americans and non-Hispanics) were discriminated against by being given shorter and less lucrative assignments (with less cumulative pay) than Hispanics.  For example, an assignment could last from a few days to a period of months.  Hispanics received projects that were longer and more lucrative.

18. DEFENDANT SULZER only routinely used a few African-Americans on work crews, which usually contained one or two other African-Americans on the work schedules for a crew that would contain approximately 40 (forty) team members.

### E.  MATERIAL FACTS – ARNOLD BLAKE

19. BLAKE found a noose in the SULZER trailer on March 8, 2015 while on assignment for SULZER in North Salt Lake, Utah.

20. On March 9, 2015, BLAKE reported the noose during a meeting to SULZER Superintendent Emanuel Vargas.

21. BLAKE asked Superintendent Vargas if the noose was a tool for the job.

22. Superintendent Vargas responded, among other things, that:

    a. *"This is very wrong. It's against the law to do that sh\*t."*

    b. *"This sh\*t is illegal."*

    c. *"Sometimes the guys starting f\*\*king around."*

23. Superintendent Vargas also told BLAKE that he knew of another person from Louisiana who also made nooses in the past, and that he had been informed that the nooses made by the employee from Louisiana were illegal.

24. BLAKE was terminated despite the fact that another SULZER employee named Horelle Ramos said that he knew that the noose was there, and that "whoever did it is f\*\*ked up."

25. Mr. Ramos also stated that he had seen nooses at other SULZER job sites.

26. Eventually, the noose was taken down. BLAKE was told that the noose would be given to a representative in SULZER's Safety Department.

27. SULZER's Compliance Officer (Nicholas Manno) informed BLAKE in March 2015 that "the noose no longer exists."

28. On approximately March 10, 2015, after no action had been taken with regard to his first complaint regarding the noose to Superintend Vargas, BLAKE reported the noose for a second time when he called SULZER's "anonymous hotline."

29. On March 17, 2015, SULZER employee Jon Camarillo (Hispanic) told BLAKE, "You like to be called Blake because you are Black." BLAKE reported this to Brian Guillory (Safety Department).

30. On March 19, 2015, MANNO contacted BLAKE in response to his March 10, 2015 phone call to the SULZER hotline.

31. Following their March 19, 2015 telephone call, Mr. Manno sent BLAKE an email asking if they could speak about the noose during the week of March 23, 2015.

32. The very next day after speaking with Mr. Manno, BLAKE was called into a meeting with Lee Anna Washington (Head of Human Resources, Tower Field Services), Michael Lochbaum (QESH Manager TFS NSA, Tower Field Services), and Willie (last name unknown) (Project Management) on March 20, 2015.

33. In the March 20, 2015 meeting, the three (3) SULZER officials informed BLAKE of allegations that he had abandoned his Hole Watch/Fire Watch post, and that he had fallen asleep while at a Hole Watch/Fire Watch assignment.

34. Also during the March 20, 2015 meeting that was ostensibly regarding abandonment/falling asleep, Ms. Washington questioned BLAKE about his "anonymous hotline" call, and his conversation with MANNO after he reported the noose to the anonymous hotline.

35. Also during the March 20, 2015 meeting, Mr. Lochbaum mentioned that his intention was originally to terminate BLAKE, but changed his mind after hearing the rest of the facts from BLAKE.

36. Mr. Lochbaum also stated during the March 20, 2015 meeting that abandoning the Hole Watch/Fire Watch was an offense, that if true, is one for which

an employee should have been immediately escorted to the gates under SULZER's policy.

37. BLAKE was not immediately escorted to the gates after BLAKE was alleged to have abandoned his Hole Watch/Fire Watch position.

38. On March 25, 2015, BLAKE mentioned to a co-worker named Albert (last name unknown) that he was hungry and that he wanted some Frenchy's Chicken. Albert (Hispanic) said to BLAKE, "You like chicken because you are black."

39. BLAKE reported both the March 17, 2015 incident involving Jon Camarillo and the March 25, 2015 incident involving Albert to Mr. Manno on March 25, 2015 by email.

40. Also on March 25, 2015, another SUZLER employee informed BLAKE that, Saul Hernandez (Hispanic) (SULZER's Personnel Manager, Tower Field Services) said to him, "What's up, nigger?"

41. There were numerous occasions where racial slurs were directed towards African-American employees (as well as Caucasians), and nothing was done to correct such behavior after being reported.  For example, BLAKE was also told by a SULZER employee that Nick Villareal (Superintendent) told Mr. Hernandez, "We ain't gonna have no coons on this job."  The word coon and "mayate pendejo"[1] was commonly used at SULZER.

42. On March 26, 2015, Joel Hernandez (SULZER Superintendent) asked BLAKE whether he had contacted the anonymous hotline either the day before or that morning.

---

[1] Mayate is an extremely offensive term for African-Americans. Pendejo means stupid or dumbass.

43. Mr. Hernandez then instructed BLAKE that he would be working inside a tower that day and doing the work of a Mechanic 1/2/3. This was despite BLAKE informing Mr. Hernandez that an assignment as a Mechanic 1/2/3 was inconsistent and incompatible with the role he had been performing for SULZER of Hole Watch/Fire Watch up until Mr. Hernandez inquired as to whether BLAKE had contacted the "anonymous hotline."

44. BLAKE informed Mr. Hernandez that he felt unsafe accepting the re-assignment because of his unfamiliarity with the duties of the Mechanic position, as well as his overall personal safety due to what he believed to be evidence of retaliation.[2]

45. BLAKE was additionally concerned about his safety, and the sudden job assignment change, due to national news reports of an investigation by the FBI, the Justice Department's Civil Rights Division and the United States Attorney's office into the death of an African-American man in Mississippi on or around March 19, 2015, who was found hanging.[3]

46. BLAKE complained to Mr. Manno (through undersigned counsel) that Mr. Hernandez's tower reassignment was retaliatory and that he feared for his safety.

47. Following BLAKE's complaints of discrimination and retaliation, SULZER terminated BLAKE's employment, effective April 13, 2015 by notice to undersigned counsel on April 14, 2015.

---

[2] While on paid leave due to BLAKE's concerns about his safety, SULZER failed to pay BLAKE "on time" and "as promised" for 34 hours. As possible further proof of retaliation, BLAKE was not paid for those hours until one week after the original payday.

[3] The victim was 54-year old Otis Byrd of Port Gibson, Mississippi.

48. SULZER claims that BLAKE was terminated based on alleged safety violations, despite the fact that at least two meetings had been held with BLAKE and management in which no action was taken against BLAKE.

49. SULZER officials informed BLAKE through undersigned counsel that they concluded the noose was actually an empty "paper towel holder," despite the comments by Superintendent Vargas and Mr. Ramos to the contrary, including having seen nooses at other Sulzer sites.

50. The basis for SULZER's claim that the noose was actually not a noose was the fact that the circle of the noose was pointed north (up), and that in order to be properly considered a noose, the circle would have to be pointed south (down), making this instrument appear more like a "lollipop."

51. BLAKE (as well as other African-Americans and non-Hispanics) was informed by Hispanic co-workers that he was paid between $5 to $16 dollars less than Hispanics in the same role, or for doing the same work.

52. BLAKE (as well as other African-Americans and non-Hispanics) was given shorter duration job assignments, and routinely given mediocre or redundant jobs despite his experience level.

53. BLAKE (as well as other African-Americans and non-Hispanics) was practically excluded from meetings because Safety Meetings and "start of shift" meetings are held either exclusively or primarily in Spanish.

54. BLAKE (as well as other African-Americans and non-Hispanics) was given assignments of shorter duration and less lucrative (with less cumulative pay) than Hispanics (often months long assignments).

### F. MATERIAL FACTS – JOEL DEFFEBAUGH

55. PLAINTIFF DEFFEBAUGH earned a pay raise of $2.00 per hour, but it was not reflected in his paycheck immediately, while Hispanic employees typically received the increase immediately.

56. PLAINTIFF DEFFEBAUGH reported the missing backpay to management, but was never paid the backpay that he had earned. However, Hispanic employees who were owed backpay received the backpay when they complained about it being missing from their paychecks.

57. PLAINTIFF DEFFEBAUGH was told that there was no work available, while Hispanic employees were being given assignments.

58. PLAINTIFF DEFFEBAUGH complained to both Saul Hernandez (Personnel Manager, Tower Field Service), Romeo Moreno (Assistant, Tower Field Service) and Brett Smith (Field Safety) about the preferential treatment that Hispanics received, compared to African-Americans and non-Hispanics, and the ways in which he had been discriminated against. DEFFEBAUGH was told, "We don't have any work."

59. PLAINTIFF DEFFEBAUGH, who was a Mechanic, was given Hole Watch/Fire Watch Duty, whereas Hispanics were given better work assignments despite their level of experience.

60. PLAINTIFF DEFFEBAUGH complained about meetings being conducted only in, and was told "You need to learn Spanish."

61. PLAINTIFF DEFFEBAUGH also complained that SULZER failed to give African-Americans and non-Hispanics the same types of project work assignments (quality and duration of work) as Hispanics.

62. PLAINTIFF DEFFEBAUGH also complained that SULZER had only a few African-Americans on work crews (there were usually only one or two other Blacks on a crew of forty).

63. After DEFFEBAUGH complained about the preferential treatment that Hispanic employees received, including but not limited to higher salary, immediate payment of increases in salary, immediate payment of backpay when demanded, the low percentage of African-Americans on work crews, Spanish only meetings shorter duration work assignments, he was retaliated against by not being given his backpay; and in not being given additional work assignments, although he was told he was on the list to receive such assignments, resulting in his constructive discharge.

64. After PLAINTIFF DEFFEBAUGH complained about the treatment, Joel Hernandez (SULZER Superintendent) repeatedly told DEFFEBAUGH that he had been added to the work list for different jobs; however, whenever DEFFEBAUGH would inquire as to his next assignment either by phone or in person at the SULZER office in Humble, Texas, he was told there was no work available.

### G. COUNT 1– RACE DISCRIMINATION, NATIONAL ORIGIN DISCRIMINATION AND RETALIATION UNDER TITLE VII

65. PLAINTIFFS incorporate by reference each of the facts alleged in paragraphs 1 through 64 as if fully stated herein.

66. PLAINTIFFS were employees within the meaning of the Title VII and belong to the class of employees protected under the statute, namely, African-American.

67. DEFENDANT is an employer within the meaning of the Title VII.

68. PLAINTIFFS were both qualified for their positions.

69. PLAINTIFFS both suffered adverse employment actions.

70. PLAINTIFFS were treated less favorably because of their membership in their protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

71. PLAINTIFFS' job performance was always satisfactory or better at all times relevant herein.

72. DEFENDANT'S actions demonstrate that it has engaged in racial discrimination and retaliatory practices with malice or with reckless indifference to PLAINTIFF's protected rights and is in violation of Title VII of the Civil Rights Act.

73. DEFENDANT, as alleged herein, discriminated against PLAINTIFF BLAKE on account of his race and national origin as follows: Termination of employment; Wrongful discipline; Lesser pay compared to Hispanics; and Working out of class.

74. DEFENDANT, as alleged herein, discriminated against PLAINTIFF DEFFEBAUGH on account of his race and national origin as follows: Lesser pay compared to Hispanics; Working out of class; Constructive discharge; and Denial of work assignments.

75. PLAINTIFFS complained of this discrimination as outlined in the paragraphs above.

76. Because of PLAINTIFF BLAKE's complaint regarding the noose, as well as the discriminatory manner in which he was treated during his employment with DEFENDANT, BLAKE was made a victim of retaliation.  This retaliation against BLAKE was demonstrated in his being questioned by Joel Hernandez (SULZER Superintendent) regarding his having contacted the anonymous hotline either the

day before or that morning; by his immediate reassignment to Tower duty after being questioned about his reporting of discrimination and/or retaliation to SULZER; and further, by his ultimate termination (based on alleged policy violations) in close proximity to his complaints.

77. Because of PLAINTIFF DEFFEBAUGH'S complaints regarding the discriminatory manner in which he was treated during his employment, DEFFEBAUGH was made a victim of retaliation. This retaliation against DEFFEBAUGH was demonstrated in his not being paid his duly earned backpay immediately, or not at all; further in his not given additional work assignments despite assurances that he was on the list for such work; and ultimately in his not being given any additional work assignments, or only offered assignments of the short duration complained of above which had prompted an earlier complaint of discrimination (because Hispanics were receiving longer duration, and thus, more lucrative) job assignments, resulting in his constructive discharge.

78. Such discrimination and retaliation have caused PLAINTIFFS to suffer damages of severe emotional distress, lost wages, including lost raises, retirement benefits, loss of promotion, and other benefits associated, as PLAINTIFFS have been subjected to adverse employment actions as a result of the discrimination and retaliation. Such discrimination and retaliation was committed with malice and reckless indifference to the rights of PLAINTIFFS who endured discrimination, opposed such, and reported discriminatory behavior and desire to be treated equally pursuant to the intent of the statute to protect victims from such actions.

79. PLAINTIFFS have been denied opportunities to which they were entitled and such benefits and privileges that they would have received if they had not been intentionally discriminated and retaliated against by DEFENDANT. PLAINTIFFS are now suffering and will continue to suffer past and future pecuniary losses, emotional and physical pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. These irreparable injuries and monetary damages are the result of DEFENDANT'S retaliatory practices and they will continue unless and until this Court grants relief.

80. In bringing this action, PLAINTIFFS have been required to retain the services of counsel and they are, therefore, entitled to an award of attorney fees.

### H.     COUNT NO. 2-RACIAL DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND RETALIATION UNDER RECONSTRUCTION CIVIL RIGHTS ACTS, 42 U.S.C. § 1981

81. PLAINTIFFS repeat and re-allege paragraphs 1 through 80 with the same force and effect as though fully set forth herein.

82. DEFENDANT'S intentional racial discrimination against PLAINTIFFS as well as the pattern and practice of this are in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. § 1981.

83. DEFENDANT'S retaliation against PLAINTIFFS as well as the pattern and practice of this are in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. § 1981 as well.

84. DEFENDANT'S intentional hostile work environment in which PLAINTIFFS were forced to work as well as the pattern and practice of this are in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. § 1981.

85. Such discrimination, hostile work environment and retaliation have caused PLAINTIFFS to suffer damages of severe emotional distress, lost wages, including lost raises, retirement benefits, loss of promotion, and other benefits associated as PLAINTIFFS have been subjected to adverse employment actions as a result of the discrimination and retaliation.

86. Such discrimination, hostile work environment and retaliation were committed with malice and reckless indifference to the rights of PLAINTIFFS and other racial minorities to "have the same right...to make and enforce contracts... as is enjoyed by other citizens" and to the intent of the statute to protect victims from unequal treatment. Such malicious or reckless indifference warrants an award, *inter alia*, of compensatory and punitive damages, as are authorized by law for 42 U.S.C. § 1981 violations.

87. In bringing this action, PLAINTIFFS have been required to retain the services of counsel and they are, therefore, entitled to an award of attorney fees.

I. **COUNT NO. 3-HOSTILE WORK ENVIRONMENT UNDER TITLE VII OF THE CIVIL RIGHTS ACT**

88. PLAINTIFFS repeat and re-allege paragraphs 1 through 87 with the same force and effect as though fully set forth herein.

89. DEFENDANT has an obligation under the law to assure an environment free from harassment on the basis of race.

90. DEFENDANT, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of race and national origin. DEFENDANT, by and through their managers, supervisors, directors and vice principals, either knew

about the hostile work environment and failed to take remedial action or themselves created a hostile work environment based on race.

91. PLAINTIFFS were subjected to a hostile work environment based upon their race and national origin. They belong to a protected class, African American, were was subject to unwelcome harassment, the harassment was based upon their membership in the protected class, the harassment affected a term, condition or privilege of their employment and DEFENDANT knew or should have known of the harassment and failed to take prompt remedial action.

92. Prior to PLAINTIFF'S complaints of discrimination, it was evident that SULZER exhibited a different standard of treatment toward non-African American employees, in favor of Hispanic employees. Examples include the demeaning, derogatory terms used to describe African-Americans and treatment as if they are inferior, and previous nooses being created by SULZER employees, and SULZER employees, supervisors and managers being aware of such past instances.

93. The facts demonstrating that PLAINTIFFS were subjected to a hostile work environment based on race and national origin (African American), include the following: PLAINTIFFS are African American. The Hispanic managers and supervisors exhibited a different standard of treatment toward non-African American employees. This harassment affected a term, condition, or privilege of the PLAINTIFF'S employment, in that it was sufficiently severe or pervasive to create a work environment that is both subjectively and objectively abusive, *i.e.*, one that PLAINTIFFS perceived as abusive and one that a reasonable person would find hostile or abusive.

94. In doing the acts set forth above, DEFENDANT acted intentionally, and with a conscious disregard of PLAINTIFFS' rights to work in an environment free from racial and national origin hostility. DEFENDANT has acted, and continue to act, with a reckless disregard of its obligations under the law. The DEFENDANT'S conduct, as alleged herein, was and is despicable, malicious and oppressive. The PLAINTIFFS are therefore entitled to an award of punitive damages in an amount to be proven at the time of trial.

95. In bringing this action, PLAINTIFFS have been required to retain the services of counsel and they are, therefore, entitled to an award of attorney fees.

### J.  DEMAND FOR JURY TRIAL

96. PLAINTIFFS hereby request a jury trial for all claims.

### K.  PRAYER FOR RELIEF

97. Wherefore, PLAINTIFFS pray that the Court grant them the following relief:

    a. Compensatory damages;

    b. Back pay to the date of trial;

    c. Front pay;

    d. Damages for mental pain and suffering;

    e. Reasonable attorneys' fees;

    f. Costs of suit;

    g. Punitive damages;

    h. Injunctive relief;

    i. Expert Fees;

    j. Pre-judgment interest at the highest rate allowed by law;

      k.  Post-judgment interest at the highest rate allowed by law;

      l.  Such other relief as the Court deems just and reasonable.

RESPECTFULLY SUBMITTED,

_____
Paul K. Stafford
State Bar No. 00791716
USDC SD/TX No. 1065517
pstafford@staffordbarrow.com
**STAFFORD BARROW, PLLC**
400 N. St. Paul St., Ste. 1100
Dallas, Texas 75201
(214) 306-0977  - TEL
(214) 206-9445 – FAX